**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
Norfolk Division

MARJORY C.,[1]

        Plaintiff,

v.                                     ACTION NO. 2:20cv525

KILOLO KIJAKAZI,[2]
Acting Commissioner of Social Security,

        Defendant.

**UNITED STATES MAGISTRATE JUDGE'S**
**REPORT AND RECOMMENDATION**

Marjory C. filed this action for review of a decision by the Commissioner ("Commissioner") of the Social Security Administration ("SSA") partially denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

An order of reference assigned this matter to the undersigned. ECF No. 17. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure, and Local Civil Rule 72, it is recommended that Marjory C.'s motion for summary judgment (ECF

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

[2] Kilolo Kijakazi is the Acting Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d); *see also* 42 U.S.C § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

No. 19) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 21) be **GRANTED**.

## I.  PROCEDURAL BACKGROUND

Marjory C. ("plaintiff") protectively filed an application for disability insurance benefits on October 17, 2018, alleging she became disabled on October 5, 2018, due to multiple physical and mental impairments. R. 101–02, 202, 250.[3]  Following the state agency's denial of her claim, both initially and upon reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). R. 101–15, 118–32, 155–56.  ALJ O. Price Dodson heard the matter on April 30, 2020, and issued a decision partially denying benefits on June 3, 2020.  R. 39–59, 61–89. Specifically, ALJ Dodson found plaintiff was disabled beginning on March 30, 2020, but not earlier. R. 54–55.  On August 11, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 6–10.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff commenced this *pro se* action on October 19, 2020.[4]  ECF No. 1.  The Commissioner answered the complaint on April 13, 2021. ECF No. 15.  In response to the Court's order, plaintiff and the Commissioner filed motions for summary judgment, with supporting memoranda, on April 27, 2021, and May 27, 2021, respectively. ECF Nos. 18–22.  Plaintiff filed a reply on June 21, 2021.  ECF No. 24.  As no

---

[3] Page citations are to the administrative record that the Commissioner previously filed with the Court.

[4] Plaintiff filed her proposed complaint on October 19, 2020, and it was docketed on October 26, 2020. ECF Nos. 1, 3. On January 29, 2021, the Appeals Council granted plaintiff an extension of time until October 19, 2020, to file suit. R. 2.

special circumstances exist that require oral argument, plaintiff's request for a hearing (ECF No. 26) is **DENIED** and the case is deemed submitted for a decision.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    *Background Information and Hearing Testimony by Plaintiff*

Plaintiff was 53 years old at the time of her alleged onset date of disability of October 5, 2018, and, as of the date of the hearing and the ALJ's decision, she was 55 years old—an individual of "advanced age" under SSA rules. *See* R. 53–55; 20 C.F.R. § 404.1563(d), (e).[5]  She has a bachelor's degree and last worked as a case manager for a community services board assisting individuals with mental health limitations from February 2012 to October 2018. R. 69, 71, 252, 263. She also has prior work as a residential aide. R. 71–72, 252.

After stopping work in October 2018, plaintiff testified that she laid down for "four months" due to constant pain. R. 73. She described interstitial cystitis and stomach pain as her dominant ailment, *see* R. 79, and reported other problems related to her digestive system, including bladder pain, overactive bladder, constipation, irritable bowel syndrome, acid reflux, and bloating, *see* R. 76, 241, 250. Flare-ups of her interstitial cystitis caused her to be "bed ridden . . . for days, weeks, []months[] at a time." R. 241; *see also* R. 74. In addition, she reportedly suffered from an ovarian cyst, carpal tunnel syndrome, radiculopathy, fibrosis, pain in her lower back, legs, and right shoulder, as well as an attention deficit disorder, anxiety, and depression. *See* R. 78–79, 241, 250. As a result of her physical impairments, plaintiff indicated she had difficulty bending and could only lift 10 pounds; could sit, stand, or reach for less than two hours a day; and could walk

---

[5] For claimants aged 50-54, SSA "will consider that [their] age along with a severe impairment(s) and limited work experience may seriously affect [their] ability to adjust to other work," and for claimants aged 55 or older, the SSA presumes that "age significantly affects a person's ability to adjust to other work." 20 C.F.R. § 404.1563(d), (e).

for an hour before needing a 10-minute rest.  R. 246.  She noted her mental impairments affected her ability to complete tasks, concentrate, understand, follow instructions, and get along with others.  *Id.*

Plaintiff also testified regarding her daily activities.  R. 73–77.  At the time of the hearing, plaintiff was homeless, and was alternating among living with her daughter, a mission house, a hotel, and her car.  R. 68–69.  On a typical day when residing with her daughter, however, plaintiff would get up around 11:00 a.m., if her pain had subsided.  R. 73.  She might wash, shower, and clean her room, but then "shut down" due to pain.  *Id.*; *see also* R. 76 (noting she can bathe and dress herself, but cannot stand to shower).  She often made a simple meal like a smoothie or oatmeal, but stated she "can't cook at all for [her]self," because standing too long on her feet makes her dizzy.  R. 69, 75; *see also* R. 242–43 (noting plaintiff prepares smoothies, salads, fruits, yogurt, and oatmeal, and bakes meats, but is limited due to pain or constipation).  After that, plaintiff usually laid back down for the rest of the day due to pain, except to sit up and read on occasion or talk to her sisters on the phone.  R. 73–77.  She testified she drives to medical appointments about every two weeks and the grocery store about every three weeks.  R. 69–70.  In an adult function report, plaintiff noted she can also do the laundry, read the Bible, shop in stores and online, handle finances, watch television, and participate in an online class with accommodations, but cannot engage in social activities at church or in the community.  R. 243–45.

**B.  *Relevant Medical Record***

**1.  *Treatment at Chenault Ostroff Urological Associates***

Plaintiff received treatment for interstitial cystitis, a chronic bladder condition, from Dennis Garvin, M.D., and Harland Stresing, M.D., of Chenault Ostroff Urological Associates between October 2, 2017, and October 3, 2019.  *See* R. 96, 372–76, 622–24, 722.  The record

before the ALJ primarily reflects treatment notes from plaintiff's visits with Drs. Garvin and Stresing, including approximately 12 visits after the alleged onset date of October 5, 2018, *see* R. 360–69, 372–76, 381–84, 697–723, and 10 visits prior, *see* R. 384–407, 622–24.

During these visits, plaintiff underwent approximately three series of interstitial cystitis bladder cocktail treatments and a medication regimen with largely positive results. In the earliest record available from October 2, 2017, Dr. Garvin administered the fourth installment of the first series of bladder cocktails and observed that plaintiff "has been getting better and when there is some return of the symptoms they seem to be less." R. 622. By the sixth installment of the first series on October 16, 2017, Dr. Stresing wrote that plaintiff "is doing much better with virtually no nocturia and only daytime [urinary] frequency about 4–5 times," and he opined that plaintiff "was better now" and that they "ought to leave things alone at this point." R. 404. At that time, a physical examination was unremarkable,[6] plaintiff was "on a good medication protocol[,] and tolerating the Elmiron [medication w]ell." R. 405.

Treatment notes from visits during the next five months similarly reflected positive developments regarding plaintiff's interstitial cystitis. On November 13, 2017, Dr. Stresing observed that plaintiff, "having completed her intravesical therapy" and "taking only one elmiron tablet daily," "is much more comfortable," "has nocturia only one time at the most nightly," "has much less bladder discomfort, pain and urgency and has achieved a very good response to this treatment protocol." R. 401. On February 13, 2018, he wrote that "from a bladder standpoint [plaintiff] is doing about as well as she usually does," and that "generally [she] has pretty good

---

[6] The physical examination revealed a "[w]ell[-]developed, well-nourished female in no acute distress," "[n]o peripheral swelling," "[n]o respiratory distress," a "soft and nontender" abdomen without masses, "[n]o [costovertebral angle] tenderness," normal skin color, a "[p]atient with appropriate affect" who is "[a]lert and oriented," and "[n]o enlargement" of the lymph nodes. R. 405.

control." R. 398. He noted, however, that "she does have some urgency early in the morning," and sometimes goes into work late due to pain. *Id.* Dr. Stresing wrote a note for plaintiff indicating "that she might be able to adjust her work schedule a little bit because of her extra pain but she does not need any more medication at this time and [we] will see her back in about 6 months to a year." R. 400. On March 14, 2018, plaintiff underwent a cystoscopy with hydrodistension "in the hopes of calming her bladder and bladder pelvic pain down a little bit," R. 388–95, and two days later, Dr. Stresing wrote plaintiff "is doing much better, having much less pain and urinary frequency and urgency," R. 386. Plaintiff's physical examinations during this time were largely unremarkable.[7]

In late April 2018, treatment notes reflect a worsening of symptoms associated with interstitial cystitis, but plaintiff responded well to medication. On April 27, 2018, Dr. Garvin wrote that plaintiff "had been doing well for a period of time" following the cystoscopy with hydrodistention, but that her "symptoms become worse when she is reaching very difficult case loads as a social worker." R. 385. On May 17, 2018, Dr. Garvin suggested plaintiff obtain some accommodations at work related to "the number, stability, and laxity level" of her work, as well as the ability to "stay home if [her] pain is severe." *Id.* He noted that the hydrodistention no longer "seem[s] to be doing any good" and he prescribed a low-dose of amitriptyline. *Id.* The prescription appeared to be effective. At an unrelated psychiatry visit on June 4, 2018, plaintiff reported that "Elavil [brand-name amitriptyline] is working well to control her painful bladder syndrome and in addition she is sleeping much better." R. 538. On August 17, 2018, Dr. Garvin

---

[7] Physical examinations on November 13, 2017, February 13, 2018, March 5, 2018, March 14, 2018, and March 16, 2018, were nearly identical to the previous physical examination on October 16, 2017, with the exception of one added note on February 13, 2018, that plaintiff was "very agitated today and very talkative." *Compare* R. 387, 392, 396, 399, 402, *with* R. 405.

reported that plaintiff "has been doing very well on this regimen and has had no adverse effects," but he still noted that "the extremities of her job situation will again precipitate the discomfort" although he did not believe that considering disability was "reasonable because really all she needs is certain accommodations at work." R. 384.

By November 26, 2018, and after her alleged onset date of October 5, 2018, plaintiff decided with Dr. Garvin to try a second series of bladder cocktail treatments "again because, back when she was under less stress, the cocktail seemed to provide some benefit." R. 376. At the second installment of the second series of bladder cocktails on December 14, 2018, Dr. Stresing wrote that plaintiff was "getting some relief." R. 372. The third installment on December 21, 2018, "did not seem to work as well," *see* R. 363, 367, but at the fifth and final installment of this second bladder cocktail series on January 15, 2019, Dr. Stresing wrote that plaintiff was "doing very well and has minimal discomfort or pain," R. 361. At this last visit, he observed that plaintiff's "only complaint now is her lower back and orthopedic issues," and that "[h]er urological system is now under pretty good control." *Id.* Physical examinations during this time were unremarkable.[8]

Plaintiff did not return to Chenault Ostroff Urological Associates until July 30, 2019—six months later—due to a flare-up of her interstitial cystitis. R. 697. Dr. Garvin recommended "another series of bladder cocktails once a week for 3 weeks." *Id.* At the end of this third series on October 3, 2019, Dr. Garvin observed that the bladder cocktails "helped her greatly." R. 722. Although plaintiff noted some renewed bladder pain after "moving and packing and arranging of things far beyond her normal capabilities," he noted that "this is somewhat different" and that

---

[8] Physical examinations during this timeframe on December 14, 2018, December 21, 2018, January 8, 2019, and January 15, 2019, were largely identical to Dr. Stresing's prior physical examination on October 16, 2017. *Compare* R. 362, 365, 368, 373, *with* R. 405.

plaintiff "took [one] of her daughter's metronidazole pills and this seemed to help greatly." *Id.* Plaintiff's physical exams during this time were unremarkable.[9]

### 2. *Treatment by Anwarul Islam, M.D.*

Plaintiff visited her primary care provider, Anwarul Islam, M.D., five times between January 2017 and April 2019 for a variety of ailments, which were typically treated with medications and recommendations for diet and exercise. *See* R. 546–56. Prior to her alleged onset date, plaintiff presented on April 24, 2018, complaining of extreme weakness and tiredness. R. 551. An examination revealed high cholesterol, or hyperlipidemia, but was otherwise largely unremarkable.[10] R. 551–52. Dr. Islam recommended a low cholesterol diet, exercise, and prescribed Lipitor for dyslipidemia. R. 552. After the alleged onset date, on December 14, 2018, plaintiff visited Dr. Islam for a follow-up on the dyslipidemia, as well as for constipation, heartburn, abdominal pain, nausea, and vomiting. R. 549. An examination yielded similar results,[11] and Dr. Islam made additional diagnoses of abdominal pain, esophageal reflux, and

---

[9] A physical examination on August 6, 2019, by Dr. Stresing was nearly identical to his previous examination results. *Compare* R. 704–05, *with* R. 405. A physical examination on August 20, 2019, by Dr. Garvin also yielded ordinary findings. *See* R. 714 (finding plaintiff was well-developed, well-nourished, and had no apparent distress; her head was normocephalic, had a normal range of movement, normal pupils and extraocular movement, no masses, and normal conjunctiva; her neck had normal movement, no evidence of mass, and no adenopathy; her lungs had no respiratory distress or difficulties; her cardiovascular system had no evident peripheral swelling; her abdomen had normal bowel sounds and no masses, tenderness, or organomegaly; her extremities had no edema, arthritis, deformity, or swelling; and she was oriented with no evident anxiety, and no cognitive impairment).

[10] The examination revealed plaintiff was alert and oriented to all three spheres; findings for the head, eyes, ears, nose, and throat were unremarkable; her lungs were clear; her heart had a regular rhythm; her abdomen showed positive bowel sounds, but was non-tender; her neurological system was grossly normal with no sensor motor deficit; her extremities had no edema, no cyanosis, and good peripheral circulation; her skin had good turgor; a comprehensive metabolic panel was unremarkable; and an electrocardiogram showed a normal sinus rhythm. R. 551–52.

[11] The results of the examination were nearly identical to the previous visit on April 24, 2018, but no comprehensive metabolic panel nor electrocardiogram were performed. *Compare* R. 549–50,

8

nonrheumatic aortic valve disorder.  R. 549–50.  He advised diet, exercise, prescribed omeprazole, and referred plaintiff to gastroenterologist, Michael Sperling, M.D.  R. 550.  At a follow-up appointment on April 15, 2019, plaintiff reported a recent diagnosis of fatty liver and that she had received a cortisone shot for back pain.  R. 547.  She also complained of dizziness and vertigo.  *Id.*  Dr. Islam's exam had the same findings as the previous visit, *compare* R. 547–48, *with* R. 549–50, but he added a diagnosis of fatty liver, R. 548.  He recommended a low cholesterol, weight reducing diet, increased activity, and continued use of current medications.  *Id.*

### 3.    *Treatment at Gastroenterology Associates – Norfolk*

Plaintiff received treatment from Michael Sperling, M.D., of Gastroenterology Associates between March 2019 and May 2019 for bloating and abdominal pain.  *See* R. 573, 575, 578, 584, 590.  Physical examinations on March 3, 2019, and March 19, 2019, were positive for distended bowel sounds and a paravertebral spasm, but exams on April 23, 2019, and May 15, 2019, were unremarkable.[12]  *See* R. 573, 576–77, 579–80, 585–86.  On March 27, 2019, a CT scan of the abdomen and pelvis revealed a "[m]oderate colonic stool burden," a "[s]ub-6 mm pulmonary nodule," and "[l]ikely nabothian cysts."  R. 591–92.  That same date, a transvaginal and transabdominal pelvic ultrasound revealed a uterus "within normal limits," R. 593–94, but an ultrasound of the abdomen showed "mild defuse increased echogenicity" in the liver consistent

---

*with* R. 551–52.

[12] Physical exams on April 23, 2019, and May 15, 2019, showed plaintiff was alert, not in acute distress, and well-nourished; her neck was supple with no masses; her thyroid was of normal size and consistency and without masses; her eyes had no scleral icterus or injection; her mouth and throat had no abnormal pigmentation, ulcers, or lesions; her chest and lungs were clear; her cardiovascular rhythm was regular; her heart sounds were normal; her abdomen was nontender and had no masses or hernias; her bowel sounds were normal; her lower extremities showed no edema bilaterally; and cervical adenopathy was not present.  R. 579–80, 585–86.

with hepatic steatosis, or fatty liver disease, as well as gallbladder cholesterolosis, R. 595–96. A May 3, 2019, sigmoidoscopy revealed an anal fissure, for which Amitiza and a hydrocortisone cream were recommended. R. 587. At the May 15, 2019 appointment, Dr. Sperling assessed abdominal pain of the left upper quadrant, anemia, and rectal bleeding. R. 586. He prescribed a trial of Amitiza for the abdominal pain and recommended a colonoscopy for the rectal bleeding, but had no treatment indicated for the anemia. *Id.* The colonoscopy yielded normal results. R. 589. On May 28, 2019, an esophagogastroduodenoscopy revealed "[b]ile gastritis, without evidence of hemorrhage," and Dr. Sperling advised waiting for the pathology report from the biopsies. R. 588. The biopsies were unremarkable. R. 590.

### 4. *Treatment at The Spine Center at Chesapeake*

Between January 14, 2019, and August 21, 2019, plaintiff sought treatment at The Spine Center at Chesapeake for lower back pain. *See* R. 557, 561, 564, 567, 615, 737. In a check-the-box medical source statement, Timothy Winkler, certified physician's assistant ("PA"), indicated that plaintiff suffered from "L5/S1 lumbar spinal stenosis" that caused lower back pain, pain and numbness in the legs, and fatigue or malaise. R. 737. He opined that she could rarely lift and carry 10 pounds on a regular basis and that she could sit, stand/walk, carry, and reach less than two hours in an eight-hour workday. *Id.* PA Winkler also noted that plaintiff required an assistive device to ambulate, must elevate her legs at least waist-level 50 to 60 percent of the day, had an extreme impairment of her ability to focus and concentrate, and would be absent four or more days per month if employed full-time. *Id.*

The remaining records from The Spine Center at Chesapeake consist of treatment notes from five office visits. At plaintiff's first visit on January 14, 2019, PA Winkler conducted a physical examination and noted that plaintiff "seems to be in pain." R. 567. Otherwise, the

findings of the physical exam were unremarkable.[13] *Id.* After reviewing x-rays of the spine, PA Winkler assessed lower back pain and degeneration of the lumbar disc, and prescribed physical therapy, a Medrol pack, and a follow-up for epidural steroid injections, if the prior treatments were ineffective. R. 568.

Physical examinations at plaintiff's next three visits with Richard Guinand, D.O., on March 21, 2019, April 11, 2019, and April 26, 2019, yielded normal findings,[14] R. 559, 562, 565, but a lumbar MRI on March 9, 2019, showed "[m]ild central canal narrowing at L3-4 due to a disc bulge, retrollsthesis, and facet arthropathy," "[m]ild spondylosis of the remaining lumbar spine without significant central stenosis," "[m]oderate foraminal narrowing from L3-4 through L5-S1," and a "[t]iny left renal cyst," R. 565. Dr. Guinand assessed lumbar radiculopathy and degeneration of the lumbar disc. R. 565–66. Because Tylenol and physical therapy had "failed," Dr. Guinand administered epidural steroid injections on March 21, 2019, and April 11, 2019. R. 561–66. On April 11, 2019, Dr. Guinand observed that plaintiff had "improved by 70%-80%," but that "[h]er pain is slowly starting to return." R. 561. Due to the lack of responsiveness to the treatment, Dr. Guinand recommended against a third injection and advised plaintiff to follow-up with PA Winkler. R. 559. On August 21, 2019, plaintiff returned to PA Winkler, who prescribed another Medrol pack and physical therapy. R. 617. Her physical examination mirrored the normal results in earlier exams. R. 559, 562, 565.

---

[13] The exam noted that plaintiff was well-developed, well-nourished, and well-groomed; her eyes had normal pupils and irises; her ears, nose, and neck were normal; her respiratory rate and effort were normal; she had a normal gait, tone, and muscle strength; she had no lymphedema; her skin had no ulcerations, lesions, or rashes; she had no neuropathy sensation and her limbs were sensate; she was oriented to person, place, and time; and her mood/affect were appropriate. R. 567–68.

[14] The results of these physical exams were nearly identical to the January 14, 2019, visit, with the exception that the findings did not include any added note indicating plaintiff seemed to be in pain. *Compare* R. 565, 562, 559, *with* R. 567–68.

**5.**      *Treatment at Parker Schlichter and Associates*

Plaintiff received psychiatric treatment from Parker Schlichter and Associates in 2017 (four visits), 2018 (four visits), and 2019 (two visits).  *See* R. 526–45, 602–03.  An evaluation on March 9, 2017, noted issues with anger, anxiety, depression, avoidance, concentration and focus, and sleep, and Charles E. Parker, D.O., diagnosed persistent depressive disorder, attention deficit hyperactivity disorder (ADHD), and insomnia.  R. 528, 530.  On January 25, 2018, LaToya Mullen, N.P., added a diagnosis of anxiety.  R. 536.  Throughout this time, the four conditions were treated exclusively with medications.[15]  R. 528, 531–34, 536–42, 544–45, 602–03.

Treatment notes indicate that plaintiff consistently had positive responses to her medication regimen.  On May 1, 2017, and August 1, 2017, plaintiff reported "doing well on all medications" with a "good tolerance of treatment and fair symptom control."  R. 531–32.  On October 27, 2017, plaintiff's ADHD medication allowed her to "perform daily routine work tasks with minimal distractions" and "ma[de] her very productive throughout her workday"; her insomnia medication allowed her to "fall and stay asleep" and plaintiff "[d]enie[d] any day-time groggi[]ness or anxiety upon awakening"; and plaintiff's depression medication "ke[pt] her anxiety levels down" and plaintiff reported "that typically she is in a good mood and . . . overall . . . feels well emotionally." R. 533.  On January 25, 2018, plaintiff reported "experiencing some increasing anxiety due to some situational life stressors," but overall, still "fe[lt] well emotionally."  R. 536.  Subsequent visits noted continued control of symptoms related to ADHD, insomnia, and anxiety.  *See* R. 537– 38 (June 4, 2018); R. 539–40 (August 25, 2018); R. 541–42 (December 29, 2018); R. 544–45 (April 1, 2019); R. 602–03 (July 2, 2019).  At her most recent visit on July 2, 2019, plaintiff was

---

[15] Medications included:  escitalopram, amphetamine-dextroamphet, temazepam, vistaril, amitriptyline, valium, and Adderall.  R. 528, 531–34, 536–42, 544–45, 602–03.

still "able to perform daily routine work tasks with minimal distractions," she "[d]enied any increased anxiety or irritability," and she "[d]enied any worsening anxiety or depression symptoms at this time." R. 602–03.

### 6.      *Miscellaneous Other Medical Records*

#### a.      *Treatment at Chesapeake Regional Medical Group*

Plaintiff visited Chesapeake Regional Medical Group's gynecology department on January 30, 2018, and January 9, 2019, for "Well Woman Exam[s]." R. 345–57. During the first visit, Fred Williams, M.D., performed a "Well Woman Exam." R. 345–50. The gynecologic examinations were "without abnormal findings," but a physical examination on January 9, 2019, revealed an ovarian mass in the left lower quadrant of her abdomen. R. 347, 350. A subsequent, transvaginal ultrasound on January 24, 2019, revealed "a simple cyst measuring 7x7x8 mm." R. 353. A mammogram on this date was negative. R. 351. No evidence of limitations associated with the cyst appears in the record.

#### b.      *Emergency Room Visits at Maryview Medical Center and Voss-Harbour View*

Plaintiff visited the emergency departments at Maryview Medical Center and Voss-Harbour View on November 15, 2018, and December 20, 2018, respectively. R. 369–72, 376–81. At the first visit, plaintiff presented to Elizabeth Snyder, P.A., complaining of bladder pain and left arm pain. R. 376. PA Snyder's impression was urinary tract infection, interstitial cystitis, and suspected overuse syndrome and carpal tunnel syndrome. R. 380. She prescribed medication, gave plaintiff a wrist splint, and directed plaintiff to follow-up with Dr. Islam, an orthopedist, and her urologists. *Id.* At the second emergency room visit, plaintiff again presented with left wrist pain and reported dropping things with both hands. R. 370. Following a physical examination, Shawn Wilson, D.O., diagnosed bilateral carpal tunnel syndrome and provided plaintiff with a

right wrist splint to wear in addition to the left splint, "especially at night." R. 371–72.

### c.   *Neurological Associates of Hampton Roads*

The record includes one medical visit to Neurological Associates of Hampton Roads on February 21, 2019. R. 517–25. Gilbert M. Snider, M.D., conducted an EMG/Nerve Conduction Study, which revealed that plaintiff had "left ulnar neuropathy in the across-elbow segment, at the medial epicondyle." R. 520. "All remaining nerves . . . were within normal limits." *Id.*

### d.   *Samuel Adediran, M.D.*

Plaintiff visited Samuel Adediran, M.D., on July 16, 2019, regarding anemia and fatigue. R. 608–09. Dr. Adediran diagnosed plaintiff with anemia, but the report is truncated, and no other treatment is noted. *See id.*

### 7.   *Consultative Examination*

On August 11, 2019, Shawne Bryant, M.D., performed a consultative examination. R. 610–14. Dr. Bryant reviewed plaintiff's medical records, activities of daily living, current medications, surgical history, and social history, and conducted a physical examination. *See id.* He noted that plaintiff was "in no acute distress, able to get on and off the examining table, up and out of the chair, and remove[] her shoes without assistance." R. 611. Further, "[s]he was not short of breath and did not present with an assistive ambulatory device." *Id.* Plaintiff's eyes, neck, lungs, cardiovascular, abdomen, extremities, skin, strength, and sensation were all without abnormalities. *See* R. 611–12. Dr. Bryant noted that plaintiff "ha[d] lumbosacral spine tenderness to palpation," but a straight leg test was negative. R. 612. Plaintiff exhibited some limits to her range of motion of her spine, shoulders, hips, and ankles,[16] with some noted "lower back pain,"

---

[16] Specifically, Dr. Bryant assessed some limitations to the range of movement in plaintiff's cervical spine flexion, right rotation, and left rotation; thoracolumbar spine flexion and extension; shoulders' external rotation; hips' flexion, internal rotation, and external rotation; and ankles'

but her "ambulation was notably brisk as well as normal." R. 612–14. Also, a neurologic examination revealed plaintiff had "[s]ome difficulty with following instructions," but she "did not appear to be anxious, had good hygiene," she was "[a]ble to perform [a] finger-to-nose maneuver bilaterally," a "Romberg [test] was negative," and her "[c]ranial nerves [were] intact." R. 612. Finally, a mental status examination revealed plaintiff was alert and fully oriented, exhibiting an appropriate affect, hearing at a normal volume, and speaking understandably. R. 611. She did, however, have decreased concentration. *Id.*

Dr. Bryant diagnosed plaintiff with (1) lower back pain, (2) interstitial cystitis, (3) depression, anxiety, and attention deficit disorder, (4) left antecubital and left carpal tunnel syndrome, (5) constipation, and (6) recurring ovarian cyst, but he opined that "patient's evaluation was not fully consistent with the severity of her alleged complaints." R. 613. He expected that plaintiff could sit one hour at a time; stand and walk 20 to 30 minutes at a time; stand and walk three to four hours in an eight-hour workday; sit six hours in an eight hour workday; carry up to 20 pounds occasionally; lift 15 pounds frequently and 30 pounds occasionally; perform manipulative maneuvers frequently on the right and occasionally on the left; and occasionally bend and stoop. *Id.* No assistive device would be needed. *Id.* He also noted that plaintiff had "decreased visual acuity and communicative limitations due to depression, anxiety, and attention deficit disorder." *Id.*

### 8.    *State Agency Physician Reviews*

Upon initial consideration on August 16, 2019, Robert McGuffin, M.D., reviewed the record relating to plaintiff's physical impairments and concluded that plaintiff could lift and carry 50 pounds occasionally and 25 pounds frequently; stand and walk for six hours during an eight-

---

dorsi-flexion, and inversion.  R. 612–14.

hour workday; sit for six hours in an eight-hour workday; push and pull without limits; climb ramps, stairs, ladders, ropes, and scaffolds occasionally; stoop, kneel, crouch, and crawl frequently; and she had no limitation in her ability to balance. R. 110–11. According to Dr. McGuffin, plaintiff was unlimited in her ability to manipulate objects, with the exception of her ability to finger objects on the left side. R. 112. She would also need to avoid concentrated exposure to hazards, such as machinery or heights, but had no other environmental limitations. R. 112–13. Dr. McGuffin appeared to rely heavily on Dr. Bryant's consultative examination, copying portions of his analysis. *Compare* R. 111, *with* R. 613.

Upon reconsideration on December 6, 2019, William Rutherford, Jr., M.D., found plaintiff more capable in most respects. R. 129–30. Although he found plaintiff could only lift and carry 25 pounds occasionally and 20 pounds frequently, Dr. Rutherford opined that she could stand, walk, and sit six hours in an eight-hour workday, frequently perform all postural limitations, and had no manipulative, visual, communicative, or environmental limitations. *Id.* He explained that plaintiff had "good results from bladder cocktail treatments and medication" in addressing her interstitial cystitis; epidural steroid injections and physical therapy led to improvement in her lower back pain; claimant has had a normal gait and full strength; and she only had a mild decrease in the flexion/extension of the thoracolumbar spine and hips. *Id.* He observed that plaintiff had chronic bladder pain, but otherwise had normal physical exams. R. 130.

On August 19, 2019, Jo McClain, Psy. D., a state agency consultant, reviewed the record relating to plaintiff's mental health impairments and concluded that plaintiff only had mild limitations in her ability to interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. R. 108–09. Citing treatment notes from NP Mullen, Dr. McClain explained that plaintiff was "receiving medication management and appears to be doing well" and her

activities of daily living were intact. R. 109. Upon reconsideration, Louis Perrott, Ph.D., found

plaintiff had no limitations in her ability to interact with others and adapt or manage oneself, but

that she did have a mild limitation in her ability to concentrate, persist, and maintain pace. R. 126–

27. He cited "good control of her [symptoms] with [treatment]," ability to complete activities of

daily living, and ability to complete college and work in a substantial gainful activity for several

years. R. 127.

## C.      *Hearing Testimony of Vocational Expert*

Andrew Beale, a vocational expert ("VE"), testified at the hearing before the ALJ. R. 81–

87. According to VE Beale, plaintiff had past relevant work as a residential aide—a skilled,

medium-exertion level position—and case manager—a skilled, sedentary exertion level position.[17]

R. 82. In his first hypothetical, ALJ Dodson asked VE Beale if work would be available for a

person with plaintiff's education and experience if that person were limited to light work; could

only stand and walk four hours in an eight-hour workday; could only occasionally bend, stoop, or

crouch; should avoid ladders or scaffolding; would be limited to performing routine, repetitive

tasks; and should avoid fast-paced production. R. 82–83. VE Beale opined that unskilled, light

work as a cashier, storage facility rental clerk, or office helper would be available for such a person.

R. 83–84. In a second hypothetical ALJ Dodson asked whether work would be available if the

---

[17] VE Beale noted that the residential aide and case manager positions had SVPs of 6 and 8 respectively. R. 82. "SVP" refers to the "specific vocational preparation" level which is defined in the DOT as "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1230 n.4 (9th Cir. 2009) (quoting *Dictionary of Occupational Titles*, Appendix C, page 1009 (4th ed. 1991)). "[U]nskilled work corresponds to an SVP of 1–2; semi-skilled work corresponds to an SVP of 3–4; and skilled work corresponds to an SVP of 5–9 in the DOT." SSR 00-4p, 2000 WL 1898704, at *3 (Dec. 4, 2000). Accordingly, plaintiff's past relevant work as both a residential aide and case manager are considered "skilled" positions.

same hypothetical individual were further limited such that she was off task more than 15 percent of the day. R. 84. VE testified that no work would be available for that individual. *Id.* Lastly, VE Beale testified that no work would be available for the hypothetical individual if she were absent from work two or more days a month on a continuing basis. *Id.* VE Beale clarified that his testimony regarding the distinction between time spent walking versus standing and sitting, as well as regarding off-task behavior and absenteeism, were based on his experience rather than the *Dictionary of Occupational Titles*, which does not address those issues. R. 84–85.

### III.    THE ALJ's DECISION

To evaluate plaintiff's claim of disability,[18] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations. *See* 20 C.F.R. § 404.1520(a). Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment. R. 41–55.

The ALJ found that plaintiff met the insured requirements[19] of the Social Security Act through December 31, 2023, and had not engaged in substantial gainful activity since October 5, 2018, her alleged onset date of disability. R. 42.

---

[18] To qualify for DIB, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act. "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a).

[19] In order to qualify for DIB, an individual must also establish a disability that commenced on or

At steps two and three, the ALJ found that plaintiff had the following severe impairments: (a) interstitial cystitis; (b) lumbar radiculopathy; (c) left ulnar neuropathy; (d) persistent depressive disorder; (e) anxiety; and (f) attention-deficit hyperactivity disorder ("ADHD"). R. 42–43. The ALJ classified any additional impairments as non-severe, as they responded to medication, did not require significant medical treatment, did not result in continuous functional limitations, or were not medically determinable. R. 43–44. The ALJ further determined that plaintiff's severe impairments, either singly or in combination (along with her other conditions), failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 44–47.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC") to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that she: (a) can stand and walk four hours in an eight-hour workday; (b) can occasionally bend, stoop, and crouch; (c) should avoid ladders and scaffolding; (d) is limited to performing routine, repetitive tasks; and (e) she should avoid fast-paced production tasks. R. 47–53.

Based upon this RFC, the ALJ found at step four that plaintiff could not resume working as a residential aide or case manager. R. 53. Finally, at step five, the ALJ found, having considered the VE's testimony and plaintiff's age, education, work experience, and RFC, that plaintiff could perform other jobs, such as a cashier, storage facility rental clerk, or office helper, which existed in significant numbers in the national economy. R. 53–55. Because plaintiff's age category changed to "advanced age" on March 30, 2020, however, the ALJ determined that plaintiff became disabled on that date through application of the Medical Vocational Rule 202.06. *Id.*; *see* 20 C.F.R.

---

before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

Pt. 404, Subpt. P, App. 2, § 202.06 (directing a finding of disabled where a claimant is limited to light work as a result of severe medically determinable impairments, of advanced age, possesses a high school education or more, and has prior skilled or semiskilled work experienced without transferable skills); 20 C.F.R. § 404.1563(e) (defining a person of "advanced age" as one "age 55 or older").

Accordingly, the ALJ concluded plaintiff was not disabled from October 5, 2018, through March 29, 2020, but was disabled and eligible for period of disability or DIB beginning on March 30, 2020. R. 55.

## IV.   THE APPEALS COUNCIL'S DECISION

On August 11, 2020, the Appeals Council denied plaintiff's request for review of the ALJ's decision. R. 6–10.  In addition to finding no error with the ALJ's decision, the Appeals Council found that the additional evidence submitted by plaintiff to SSA following the ALJ's decision did not warrant further consideration by the ALJ. R. 6–7.  That evidence included the following.

### A.   Additional Documentation from Dr. Garvin.

In a letter dated November 4, 2019, Dr. Garvin provided an overview of plaintiff's condition and her ability to work. R. 96. He explained that plaintiff has "a long-standing diagnosis of interstitial cystitis," which is a "chronic bladder pain syndrome that, in [her] case, has proven resistant to benefit from standard medications." *Id.* He opined that her "capability to perform work of any kind is completely dependent upon the degree of inflammation sustained within the wall of [her] bladder." *Id.* "[W]hen . . . not having significant inflammation," he noted she is "capable of certain tasks," but that "severe inflammation . . . render[s her] essentially bedridden or chair ridden and not capable of performing those tasks that are normally considered in routine []employment, even of a nonexertional type." *Id.* Dr. Garvin also reported "there is no way that

we can predict when [she] will have a day of severe pain and . . . [to] prevent these days from occurring." *Id.*

Dr. Garvin made similar observations in a physical RFC evaluation and pain questionnaire on September 25, 2019.[20]   R. 94–95.   He observed that plaintiff's symptoms associated with interstitial cystitis included "pelvic pain, voiding pain, [and urinary] frequency," and that these were "aggravated by diet[,] stress[, and] exertion."   R. 94.   Plaintiff's response to available medication had been "poor," he noted, and he remarked that plaintiff's interstitial cystitis was a "[l]ifelong issue."   *Id.*   Dr. Garvin also checked responses indicating that plaintiff's condition would interfere with her ability to concentrate and focus on tasks, and there would likely be days when she could not work due to pain.   R. 95.   Finally, he noted that plaintiff's prescribed medications did not cause any side effects that would interfere with her ability to work.   *Id.*

The Appeals Council found that this evidence failed to create "a reasonable probability" of altering the outcome reached by the ALJ.   R. 7.

## B.   *Additional Documentation from Dr. Stresing*

On February 13, 2018, prior to the alleged onset date, Dr. Stresing completed a Family and Medical Leave Act form about plaintiff's ability to work in light of interstitial cystitis.   R. 97–100. He checked responses indicating that plaintiff would not be absent for a single, continuous time period, but needed to attend follow-up appointments or work a reduced schedule due to her medical condition, and be absent from work during flare-ups.   R. 99.   In elaborating upon his checked

---

[20] Respondent argues that the residual functional capacity evaluation is unsigned, undated, and does not identify the author. ECF No. 22, at 12 (citing R. 94). The Court finds it reasonable to infer that Dr. Garvin authored the report, however, as the handwriting mirrors Dr. Garvin's handwriting on the following, signed page. *See* R. 94–95. This view is supported by the agency's listing of the document under the heading, "Claimant-supplied Evidence . . . from Dennis Garvin, MD," on the court transcript index for the agency record.

responses, Dr. Stresing wrote that plaintiff "should be able to come in late on occasion" due to pain.  R. 99–100.

The Appeals Council also found that this evidence failed to establish "a reasonable probability" of a different outcome before the ALJ.  R. 7.

## C.    *Evidence from Sentara Leigh Hospital's Emergency Department*

Plaintiff's additional evidence also reflects that, on July 1 and 8, 2020, she received emergency room treatment relating to cystitis and flank pain, *see* R. 13–14, 17; and scheduled follow-up medical appointments for July 23, 2020, and September 1, 2020, R. 15–16.  Along with such records, plaintiff submitted an informational handout from the Mayo Clinic regarding interstitial cystitis.  R. 18–30.

The Appeals Council observed that the disability determination only related to plaintiff's condition through the date of the ALJ's decision, June 3, 2020, and found that this additional evidence did not relate to the period at issue.  R. 7.

## V.    <u>STANDARD OF REVIEW</u>

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits.  42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)).  It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance."  *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589; *Hays*, 907 F.2d at 1456. "'Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ).'" *Craig*, 76 F.3d at 589 (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman*, 829 F.2d at 517.

## VI.   ANALYSIS

Construing plaintiff's filings liberally, the Court discerns four challenges to the Appeals Council and ALJ's decisions. *See United States v. Gholson*, 33 F. App'x 80, 81 (4th Cir. 2002) (observing that courts "must liberally construe the claims of pro se litigants" (citing *Boag v. MacDougall*, 454 U.S. 364, 365 (1982))). First, plaintiff suggests that the Appeals Council erred in denying her request for review by refusing to consider additional documents she submitted after the ALJ's decision. *See* ECF No. 3, at 12–13. Second, plaintiff has filed additional supporting documentation with this Court as attachments to her complaint and supporting memoranda, suggesting that the documents should be considered in connection with her disability

23

determination. *See* ECF No. 3, at 2–36; ECF No. 20, at 5–96; ECF No. 24-1, at 1–24.  Third, plaintiff argues that SSA improperly sent her to a chiropractor instead of a urologist for her consultative examination. *See* ECF No. 20, at 2.  Finally, plaintiff asserts that she cannot work due to her physical and mental impairments as documented by her treating physicians, *see* ECF No. 20, at 2; ECF No. 24, at 1–3, contrary to the ALJ's finding, R. 41–55.  Specifically, plaintiff does not understand why she was not given disability benefits "within 5 to 6 months from [her interstitial cystitis and bladder pain syndrome] primary diagnosis."  ECF No. 24, at 1.

A.      *The evidence plaintiff submitted to the Appeals Council does not warrant remand.*

Plaintiff suggests that the additional evidence presented to the Appeals Council warrants further consideration in the disability determination. *See* ECF No. 3, at 12–13.  In particular, she quotes Dr. Garvin's November 4, 2019, letter verbatim in multiple filings in support of her claim for disability benefits. *See* ECF No. 20, at 2; ECF No. 24, at 2.  The Commissioner argues that the evidence submitted to the Appeals Council does not warrant a remand, arguing that "[t]he Appeals Council provided valid reasons for declining to grant review of the ALJ's decision based on the late evidence, and Plaintiff has not shown that the untimely submitted documents undermined the substantial evidence upon which the ALJ relied in issuing the disability decision."  *See* ECF No. 22, at 17.

When a claimant requests Appeals Council review of an ALJ's unfavorable decision in light of additional evidence, "the Appeals Council first determines if the submission constitutes 'new and material' evidence that 'relates to the period on or before the date of the [ALJ's] hearing decision.'"  *Meyer v. Astrue*, 662 F.3d 700, 704–05 (4th Cir. 2011) (quoting 20 C.F.R. § 404.970(b)).  To be considered "new," the evidence must not be "duplicative or cumulative."  *Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991) (citation

omitted).   To be considered "material," there must be "a reasonable possibility that the new evidence would have changed the outcome." *Id.* (citation omitted).   As noted earlier, "if the Appeals Council denies review, the decision of the Commissioner [the ALJ's decision] becomes the final decision." *Gainforth v. Colvin*, No. 2:15cv205, 2016 WL 3636840, at *8 (E.D. Va. May 9, 2016), *report and recommendation adopted*, 2016 WL 3636621 (E.D. Va. June 29, 2016).   The Court does "not evaluat[e] the Appeals Council's *denial of review*." *Id.* at *10.   Accordingly, the Court turns to examining whether "after considering the additional evidence, substantial evidence still supports the ALJ's decision." *Crowder v. Berryhill*, No. 2:17cv186, 2018 WL 5305089, at *13 (E.D. Va. May 18, 2018)*; see also Parham v. Comm'r of Soc. Sec.*, 627 F. App'x 233, 233 (4th Cir. 2015).

Here, substantial evidence supports the ALJ's finding that plaintiff could perform full-time, gainful employment prior to March 30, 2020, and the documents plaintiff submitted to the Appeals Council do not alter that conclusion.   First, the evidence pertaining to plaintiff's emergency room visits and medical appointments after the ALJ's June 3, 2020 decision, has no bearing on her ability to work prior to March 30, 2020.   *See* R. 13–16.   Such evidence is consistent with a post-decision flare-up of plaintiff's interstitial cystitis, but contains no indication whatsoever that the flare-up somehow relates back to the period before March 30, 2020. *See Wilkins*, 953 F.2d at 95 (discussing requirement for newly submitted evidence to relate to the period preceding the ALJ's decision). Second, the Mayo Clinic general handout included with the emergency room documentation is undated and in no way addresses specifics regarding plaintiff's condition.   *See* R. 18–30; *see also* R. 19 (noting that "[t]he signs and symptoms of interstitial cystitis vary from person to person" and that "[s]ymptom[] severity is different for everyone, and some people may experience symptom-free periods," as well as possible "periodic[] flaring").   This document does not conflict

with the ALJ's finding that plaintiff's interstitial cystitis "is generally controlled with treatment, with some occasional flare-ups." R. 49.

Finally, the additional assessments provided by Drs. Garvin and Stresing regarding plaintiff's interstitial cystitis do not disturb the substantial evidence that supports the ALJ's finding this condition "is generally controlled with treatment, with some occasional flare-ups" either. *Id.* In a letter and pain questionnaire, Dr. Garvin opined that plaintiff's interstitial cystitis "has proven resistant to benefit from standard medications"—without specifying which medications; flare-ups of plaintiff's interstitial cystitis would render her "essentially bedridden or chair ridden," and pain would interfere with her ability to concentrate and focus. *See* R. 95–96. Dr. Stresing also noted that flare-ups would cause absences and that plaintiff would need to come late to work on occasion. R. 99–100.

The ALJ's opinion, however, expressly considered the impacts of plaintiff's interstitial flare-ups on her ability to work, and found based upon the extensive treatment notes of Drs. Garvin and Stresing that plaintiff's symptoms were "generally controlled with treatment." R. 49. This finding has ample support in the record. At the end of plaintiff's first series of bladder cocktails treatment on October 16, 2017, Dr. Stresing wrote that plaintiff "is doing much better with virtually no nocturia and only daytime [urinary] frequency about 4–5 times," and he opined that plaintiff "was better now" and that they "ought to leave things alone at this point." R. 404. At the final installment of her second bladder cocktail series on January 15, 2019, Dr. Stresing observed that plaintiff was "doing very well and has minimal discomfort or pain," her "only complaint now is her lower back and orthopedic issues," and "[h]er urological system is now under pretty good control." R. 361. After this second series, plaintiff did not return to her urologists until July 30, 2019—six months later—due to a flare-up. R. 697. By the end of a third series of bladder

26

cocktails, however, Dr. Garvin observed that the treatment "helped her greatly." R. 722. After considering the additional documentation provided from Drs. Garvin and Stresing, this substantial evidence remains to support the ALJ's findings with respect to plaintiff's interstitial cystitis.

**B.      *The documents attached to plaintiff's court filings do not warrant remand.***

Plaintiff has supplied the Court with 169 pages of attachments beyond those contained within the administrative record. *See* ECF No. 3, at 2–36; ECF No. 20, at 5–96; ECF No. 24-1, at 1–24. The Commissioner argues that the documents contained in ECF Nos. 3 and 20 do not warrant a remand. ECF No. 22, at 17–24. Specifically, she argues that plaintiff (1) has not demonstrated good cause for the late submission of evidence, and (2) has not demonstrated that the documents are material. *Id.* at 19–24. With respect to materiality, the Commissioner observes that the documents either do not relate to the period at issue, *id.* at 19–21, 23, "have nothing to do with *Plaintiff's* specific condition," *id.* at 19, and are duplicative or cumulative of documents in the record, *id.* at 14, 20, 24. Plaintiff's reply notes that many of the materials were previously provided to the SSA, and it appears she has attached them as proof of earlier submissions. *See* ECF No. 24, at 1–3.

A district court does not have the power to supplement the record developed before the SSA. *Smith v. Chater*, 99 F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714–15 (1963)). The Court may, however, consider the evidence in the context of a sentence six remand pursuant to 42 U.S.C. § 405(g). It provides:

> The court may, on motion of the Commissioner of Social Security made for good cause shown before the Commissioner files the Commissioner's answer, remand the case to the Commissioner of Social Security for further action by the Commissioner of Social Security, and it may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.

42 U.S.C. § 405(g).  Under sentence six, the court "does not rule in any way as to the correctness of the administrative determination." *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).  "Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding." *Id.*  Remand is appropriate in such a situation, because, "[i]n determining whether the ALJ's decision was supported by substantial evidence, a district court cannot consider evidence which was not presented to the ALJ." *Womack v. Astrue*, No. 3:10cv165, 2010 WL 4874935, at *4 (E.D. Va. Oct. 20, 2010) (citing *Smith*, 99 F.3d at 638 n.5).

Accordingly, a sentence six remand is appropriate where (1) the evidence is new, that is, neither cumulative nor duplicative of evidence submitted in a prior proceeding, *see Wilkins*, 953 F.2d at 96; (2) the evidence is relevant to the determination of disability at the time the claimant filed her application and the Commissioner's decision might reasonably have been different had the new evidence been considered; (3) good cause exists for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant has made a general showing of the nature of the new evidence to the reviewing court, *see Finney v. Colvin*, 637 F. App'x 711, 715–16 (4th Cir. 2016); *Campbell v. Astrue*, No. 2:11cv563, 2013 WL 1213057, at *3 (E.D. Va. Mar. 1, 2013).  The burden of proving these elements rests with the plaintiff. *Campbell*, 2013 WL 1213057, at *3.  Further, "[i]n assessing whether the claimant has made these requisite showings . . . '[t]his Court does not find facts or try the case de novo.'" *Finney*, 637 F. App'x at 716 (quoting *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).

Here, a sentence six remand directing the ALJ to consider the documents provided by plaintiff included with her court filings is unwarranted.  First, nearly all of the documents are copies of court filings in this case, correspondence with the SSA, or duplicates of those documents

28

already contained within the administrative record. *See* ECF No. 3, at 2–36; ECF No. 20, at 5–67, 69, 71, 74–76, 78–83, 90–93; ECF No. 24-1, at 4–6, 9–11.  Second, many of the remaining documents relate to medical treatment before the alleged onset date or after the ALJ's hearing and decision, and therefore, have little bearing on plaintiff's impairments and functional abilities during the period in question. *See* ECF No. 20, at 68, 70, 72–73, 77, 89, 94–96; ECF No. 24-1, at 1, 3, 8, 13–24.

Other evidence is irrelevant or immaterial.  For instance, the Bon Secours "Test Results" online printout is immaterial. *See* ECF No. 20, at 56–64.  It lists test names, providers, and testing dates from August 7, 2017, to July 8, 2020, but does not provide any information regarding test results or plaintiff's functional abilities. *See id.*  The correspondence between plaintiff and her attorney, dated June 8, 2020, and January 14, 2020, is irrelevant to plaintiff's functional abilities. *See id.* at 84–88.  A partial letter to plaintiff from Digestive & Liver Disease Specialists, dated September 25, 2019, is immaterial. *See* ECF No. 24-1, at 2.  It notes that plaintiff has "liver fibrosis" and "mild steatosis (fat deposits) of the liver," but does not suggest how plaintiff might be limited by the condition. *See id.*  Further, the letter merely refers her to follow-up treatment with Dr. Sperling, whose treatment is documented elsewhere in the administrative record. *See id.*; R. 573–99. The printout from Anthem Healthkeepers Plus, containing plaintiff's handwritten note about a conversation with the Department of Health and Social Services, is irrelevant to plaintiff's functional abilities. *See* ECF No. 24-1, at 7.  Finally, a partial "[e]ncounters" listing reports plaintiff's diagnoses of depression, ADHD, anxiety, and insomnia from May 17, 2014 to August 20, 2019.  ECF No. 24-1, at 12.  This document is immaterial, because these diagnoses are well-documented and discussed in the treatment notes contained in the record from Parker Schlichter and Associates. *See* R. 527–603. Plaintiff has not shown that the Commissioner's decision would

reasonably have been different had this additional evidence been considered.  Accordingly, remand is unjustified.

## C.     *Plaintiff's unsupported complaint about the consultative examiner's medical specialty does not warrant remand.*

Plaintiff argues that SSA erred in allegedly sending her to a chiropractor, instead of a urologist, for her consultative examination or CE, precluding any reliance by the ALJ upon that opinion in rendering his decision.  *See* ECF No. 20, at 2; ECF No. 24, at 2.

This argument is unpersuasive.  "A consultative examination is appropriate when the claimant's medical sources cannot, or will not, provide sufficient evidence about an impairment to determine whether the claimant is disabled."  *Edrwin v. Astrue*, No. 3:09cv679, 2011 WL 1086473, at *2 (E.D. Va. Mar. 23, 2011) (citing 20 C.F.R. §§ 404.1517, 416.917)).  "The decision to order a consultative examination is within the sound discretion of the [Commissioner]."  *Id.* (citing *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987); *see also* 20 C.F.R. § 404.1517 ("If your medical sources cannot or will not give us sufficient medical evidence about your impairment for us to determine whether you are disabled or blind, we may ask you to have one or more physical or mental examinations or tests.").

Here, upon initial consideration, the agency ordered a consultative examination to gather additional information about plaintiff's condition.  *See* R. 106.  SSA guidelines provide that "[g]enerally, a qualified CE source does not have to be a specialist in the medical field relevant to the claimant's impairment(s) to perform a CE.  For example, a qualified internist may perform a CE involving impairments of the musculoskeletal, cardiovascular, neurological, and other body systems."  *Selecting a Qualified Medical Source to Perform a Consultative Examination (CE)*, SSA POMS DI 22510.010, http://policy.ssa.gov/poms.nsf/lnx/0422510010.

Contrary to plaintiff's unsupported claim, *see, e.g.,* ECF No. 20, at 2, the record contains no indication that Shawne Bryant is a doctor of chiropractic care. To the contrary, the record reflects that Dr. Bryant is a physician with a medical degree, employed by Advanced Medical Consultants. R. 610 ("Shawne Bryant, M.D."). Accordingly, he possessed the qualifications to review plaintiff's medical records and conduct a comprehensive examination of her and the SSA committed no error in selecting him for this task. Moreover, while noting that Dr. Bryant's examination findings were consistent with a finding for light work, the ALJ otherwise found most of Dr. Bryant's opinions to be not persuasive and inconsistent with other evidence of record. R. 50–52. Therefore, plaintiff's suggestion that the ALJ relied upon Dr. Bryant's opinions to discount those of her urologists is unsupported. The Court finds no error.

**D.      The ALJ did not err in finding that plaintiff was disabled beginning on March 30, 2020, but not earlier, and his decision is supported by substantial evidence.**

Finally, plaintiff asserts that she cannot work due to the physical and mental impairments documented by her treating physicians, *see* ECF No. 20, at 2; ECF No. 24, at 1–3, contrary to the ALJ's finding, R. 41–55. Specifically, plaintiff does not understand why she was not given disability benefits "within 5 to 6 months from [her interstitial cystitis and bladder pain syndrome] primary diagnosis." ECF No. 24, at 1. In addition to her interstitial cystitis, which she describes as her "dominant" ailment, R. 79, plaintiff underscores her lower back pain and mental impairments as additional grounds for a finding of disability in the period before March 30, 2020. *See* ECF No. 24, at 1–3.

The ALJ found plaintiff was "not disabled" prior to March 30, 2020, because her age, education, work experience, and residual functional capacity left her "capable of making a successful adjustment to other work that existed in significant numbers in the national economy," consistent with the VE's testimony under the framework of the Medical-Vocational Rule. R. 53–

55 (discussing plaintiff's age, educational status, previous skilled work experience, and ability to perform light work with added limitations).   Because plaintiff does not challenge her age, education, or previous work experience, her challenge rests upon the ALJ's determination of her residual functional capacity.

As part of the five-step sequential analysis, an ALJ must determine a claimant's residual functional capacity, or RFC.  *See* 20 C.F.R. § 416.945.  The RFC is "the individual's *maximum* remaining ability to do sustained work activities in an ordinary work setting . . . 8 hours a day, for 5 days a week."  SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996).  An ALJ must assess a claimant's work-related abilities on a function-by-function basis.  *Id.* at *3 (assessing physical, mental, and other abilities to perform work requirements in light of limitations and impairments).  After doing so, the ALJ may express the RFC in terms of both the exertional levels of work (sedentary, light, medium, heavy, and very heavy) and the nonexertional functions supported by the evidence.  *Id.*  In determining a claimant's RFC, the ALJ must consider all relevant medical and other evidence in the record.[21]  20 C.F.R. § 416.945(a)(3).  The ALJ then uses the RFC to determine whether the claimant can perform her past relevant work (step four), and whether the claimant can adjust to any other work that exists in the national economy (step five).  *Id.* § 416.945(a)(5).

As noted above, the ALJ found that plaintiff possessed the RFC to perform light work, *see* 20 C.F.R. § 404.1567(b), subject to the limitations that she: (a) can stand and walk four hours in an eight-hour workday; (b) can occasionally bend, stoop, and crouch; (c) should avoid ladders and

---

[21] "Other evidence" includes statements or reports from the claimant, the claimant's treating or nontreating sources, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.  20 C.F.R. § 416.929(a), (c).

scaffolding; (d) is limited to performing routine, repetitive tasks; and (e) she should avoid fast-paced production tasks.  R. 47–53.  Plaintiff appears to argue that the ALJ erred in determining her RFC by failing to adequately consider the impacts of her interstitial cystitis, lower back pain, and mental impairments.  Substantial evidence supports the ALJ's findings with respect to each.

### 1.    Interstitial cystitis

As discussed in Section VII(A), the ALJ's finding that plaintiff's interstitial cystitis was "generally well-controlled except with some occasional flare-ups" finds ample support in the record.  *See* R. 45.

### 2.    Lower back pain

The ALJ also carefully reviewed plaintiff's complaints of back pain and associated treatment records.  R. 49–50.  He found that plaintiff's allegations were not fully supported in the records from the orthopedist or consultative examiner.  R. 45 (discussing absence of evidence of problems with ambulation and of medical necessity for, or actual use of, a cane)[22]; 48–49 (stating that plaintiff's alleged "extreme limitations . . . due to constant pain" fail to correspond with "subjective complaints, objective findings, or . . . treatment" shown in the medical evidence); 53 (reciting how the "normal orthopedic findings and largely unremarkable findings . . . [during the CE] do not support the complete elimination of bending, stooping, and crouching, although the claimant does allege some pain with bending").

The ALJ also pointed to the normal clinical examination findings, the lack of objective findings on examination of her spine, the mild to moderate findings in her MRI, and her

---

[22] PA Winkler's medical source statement indicates that plaintiff requires a cane or other device for ambulation.  R. 737.  However, the ALJ found this source statement to be "inconsistent with the findings and examinations [previously described, including] the lack of objective findings on examination of her spine, the mild findings in [plaintiff's] MRI, and her conservative treatment."  R. 53; *see also* R. 49–50.

conservative treatment. R. 45, 49–50, 52–53. For example, although plaintiff complained of the pain to her orthopedist and received epidural steroid injections, which reportedly provided some relief, examinations revealed she presented with a normal gait, sensation, and muscle strength and tone. R. 49–50. Further, the ALJ also noted that, during the consultative examination, plaintiff: "walked unassisted and briskly"; had no difficulty getting on and off the exam table, rising from a chair, and in removing her shoes; exhibited "full motor strength, normal sensation, and mostly normal range of motion," with slight reduction in certain "planes of her spine"; could walk on heels and toes and in tandem; and performed straight leg raises without incident. R. 50; *see* R. 45 (noting plaintiff "has never exhibited reduced motor strength, abnormal sensation, or positive straight leg raises"). As described in the summary of record evidence at Section II(B)(4), plaintiff's physical examinations in the record were largely unremarkable and the treatment remained conservative.

Nevertheless, and in giving plaintiff the benefit of the doubt and some credit to her complaints of back and bladder pain, the ALJ specified an RFC for light work, with additional restrictions to limit the time plaintiff could stand and walk, to avoid her exposure to ladders and scaffolds, and to limit her exposure to bending, stooping, and crouching. R. 47, 52–53. This determination is supported by substantial evidence.

### 3. Mental impairments

The ALJ also thoroughly reviewed plaintiff's mental health treatment and impairments, and any corresponding impacts upon her functioning and adaptation. R. 46–47, 51–53. Noting the absence in treatment records of "objective signs of abnormal memory, below average intelligence, or cognitive dysfunction," the ALJ found no more than a mild limitation in understanding, remembering, or applying information. R. 46. The ALJ also found no more than

mild limitation in interacting with others, based upon mental status exams describing plaintiff "as calm, cooperative, and well-groomed, with normal speech, no paranoia, no hallucinations, and intact associations." *Id.* The ALJ likewise found plaintiff had no more than a mild limitation in adapting and managing herself and possessed more than a minimal capacity to adapt to environmental and other changes. R. 47, 51. The ALJ based these findings upon treatment records documenting normal speech, thought content, and insight and judgment, a mostly good mood and feeling of emotional well-being, low levels of anxiety and infrequent use of anxiolytics, and "excellent response" to medication, as well as plaintiff's ability to drive, shop, and independently attend medical appointments. *Id.*

With respect to concentration, persistence, and pace, the ALJ found the treatment records to be somewhat contradictory. R. 46, 51 (comparing notes describing as calm and logical with notes reporting as easily distracted and having an attention deficit). Based upon plaintiff's hearing testimony, the CE's reporting of "decreased concentration" and "difficulty following instructions," and plaintiff's detailed self-reporting of problems in this area, including others' report of her "chang[ing] subjects while talking," the ALJ found plaintiff to be moderately limited in maintaining, concentration, persistence, and pace. R. 46, 51–52.

The ALJ concluded that plaintiff's mental health impairments resulted in only "modest symptoms," with the only "abnormality" in the area of concentration. R. 51. Notwithstanding plaintiff's reported "excellent response" to medication, particularly in maintaining attention and performing work tasks, *see* R. 51, 531–33, 537–42, 544–45, 602–03, the ALJ found a moderate concentration deficit and accounted for this in assessing plaintiff's RFC. R. 47, 51. Specifically, the ALJ limited plaintiff "to performing routine, repetitive tasks," and to work involving no "fast-paced production tasks." R. 47. Because these substantial evidence supports these findings,

*Johnson*, 434 F.3d at 653, the Court rejects any claim of error in assessing plaintiff's mental health impairments.

## VII.   <u>RECOMMENDATION</u>

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 19) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 21) be **GRANTED**.

## VIII.   <u>REVIEW PROCEDURE</u>

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail.  A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof.  *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court

based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

Robert J. Krask
United States Magistrate Judge
Robert J. Krask
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
October 22, 2021